SHAMBERG, JOHNSON & BERGMAN
Lynn R. Johnson
Douglas R. Bradley
2600 Grand Blvd., Suite 550
Kansas City, MO 64108
Telephone: (816) 474-0004
Facsimile: (816) 474-0003

JOHNSON & WEAVER, LLP
Frank J. Johnson (174882)
110 West "A" Street, Suite 750
San Diego, California 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff Irving Feldbaum*

_____

## UNITED STATES DISTRICT COURT

## DISTRICT OF KANSAS

| | |
|---|---|
| Irving Feldbaum, derivatively on behalf of SPIRIT AEROSYSTEMS HOLDINGS, INC., | ) )  Case No. 13-CV-1060-JAR-JPO ) |
| Plaintiff, | ) )  **VERIFIED SHAREHOLDER** |
| vs. | )  **DERIVATIVE COMPLAINT** ) |
| JEFFREY L. TURNER, PHILIP D. ANDERSON, CHARLES L. CHADWELL, IVOR J. EVANS, PAUL E. FULCHINO, RICHARD A. GEPHARDT, ROBERT D. JOHNSON, RONALD T. KADISH, TAWFIQ POPATIA, FRANCIS RABORN, JAMES S. SHARP, and DOES 1-10, | ) )  <u>JURY TRIAL DEMANDED</u> ) ) ) ) ) ) ) ) |
| Defendants; | ) |
| -and- | ) ) |
| SPIRIT AEROSYSTEMS HOLDINGS, INC., a Delaware corporation, | ) ) |
| Nominal Defendant. | ) ) |
| _____ | ) |

Plaintiff Irving Feldbaum ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to the allegations which pertain to Plaintiff, which allegations are based upon personal knowledge, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a verified shareholder derivative action on behalf of nominal defendant Spirit AeroSystems Holdings, Inc. ("Spirit" or the "Company") against certain of the Company's officers and directors who manipulated Spirit's cost accounting to artificially inflate earnings, who condoned those improprieties, and who knowingly made or failed to correct materially false and misleading public statements regarding those earnings, deceiving the investing public and seriously damaging the Company.

2.      Spirit manufactures structural components for commercial aircraft.  On October 25, 2012, the Company shocked investors with the surprise announcement that it would take a $590 million charge against the quarter's earnings, reportedly due to "various performance issues" and difficulty "managing complexity" in several product lines.

3.      The $590 million charge was real, but the announced reason was a falsehood. The real reason for the massive charge was that Defendants had previously caused Spirit to improperly account for incurred costs, and had done so deliberately in order to artificially inflate earnings but could no longer conceal the impropriety.

4.      Defendants manipulated the Company's cost accounting and earnings statements and issued numerous materially false and misleading statements regarding the Company's manufacturing programs and financial performance.  Because of the Individual Defendants' false statements, investors had no way to know that costs were rapidly accruing and were not being properly recognized.  Due to the false statements and improper accounting, Spirit stock traded at artificially inflated prices, reaching a high of $25.85 per share on August 8, 2012.

5.      When the truth emerged, Spirit stock plunged $6.55 per share to close at $15.11 on October 25, 2012, a decline of 30% on volume of 17.9 million shares.

1

6.      The abrupt recognition of the $590 million charge, and its immediate impact on the Company's quarterly earnings and cash flow, put Spirit in technical default on its existing loans.  The Company therefore had to petition its lenders to modify the terms of the Company's loan and credit facilities to avoid having the Company thrown into bankruptcy.

7.      The Individual Defendants concealed and failed to disclose severe manufacturing problems across multiple product lines and production processes, which led to very large scale costs and losses.  The Individual Defendants then caused Spirit to improperly account for the known costs and charges associated with these problems, which in turn caused the Company's financial statements to be materially misstated.

8.      The costs should have been accounted for and disclosed as soon as they were recognized, in accordance with GAAP and SEC guidance.  Instead, the costs were hidden, accounted for as depreciating inventory or capitalized expenditures rather than present liabilities.

9.      As a result of the Individual Defendants' accounting and earnings manipulation, and false statements and omissions, Spirit's earnings per share appeared to be much greater than they actually were, and Spirit's common stock accordingly traded at artificially high levels. When the truth finally was revealed, Spirit's market value dropped by 30%, seriously damaging the Company as well as its reputation in the market.

10.      Demand on Spirit's Board prior to commencing suit would be a useless and futile act, as the Board cannot objectively and independently consider such a demand.  Four of the nine Board members Spirit acknowledges are not independent.  All of the Board members had actual knowledge of the accounting improprieties. Three in particular, the Audit Committee Defendants (defined below) were required under Company policy to have reviewed the accounting in question, and all of the Board members personally signed off on public statements containing the false accounting, rendering their decision on whether to investigate those improprieties tainted. Further, at least two Board members engaged in unlawful insider trading.  Finally, none of the Board can be considered fully independent, as Spirit is a controlled company with just one Board

2

member representing over 64% of the Company's share voting power, including the power to remove all the other directors.

11.     On behalf of the Company, Plaintiff therefore brings this derivative action to:  (a) recover damages against the Individual Defendants for the benefit of the Company, and (b) require the Company to reform and improve its corporate governance and internal controls to better protect the Company and its shareholders and prevent the possible repetition of the damaging events described herein.

## THE PARTIES

Plaintiff

12.     Plaintiff Irving Feldbaum is a long-time shareholder of the Company and has owned Spirit stock continuously for at least three years prior to the filing of this action.  Mr. Feldbaum is a citizen of the state of Pennsylvania.

Nominal Defendant

13.     Nominal defendant Spirit AeroSystems Holdings, Inc. ("Spirit" or the "Company") is a Delaware corporation with its principal place of business at 3801 South Oliver, Wichita KS.  Spirit is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

The Individual Defendants

14.     Defendant Jeffrey L. Turner ("Turner") is the President and CEO as well as a director of the Company.  Turner became a director of Spirit in November 2006.  Turner received over $4,205,566 in compensation from Spirit in 2011.  Turner sold over $1 million worth of Spirit stock during the year prior to the filing of this action.  Turner is a citizen of the state of Kansas.

15.     Defendant Robert Johnson ("Johnson") is the Chairman of the Board of Spirit. Johnson received over $180,000.00 in compensation from Spirit in 2011.  Johnson is a citizen of the state of Arizona.

16.     Defendant Francis Raborn ("Raborn") is a director of Spirit and Chairman of the Audit Committee.  Raborn sold $571,050 worth of Spirit stock on August 16, 2012, less than two months before the announced charge against earnings and stock drop of 30% on the news. Raborn received over $175,000.00 in compensation from Spirit in 2011.  Raborn is a citizen of the state of Minnesota.

17.     Defendant Ronald Kadish ("Kadish") is a Director of Spirit and a member of the Corporate Governance and Nominating Committee.   Kadish received over $155,000.00 in compensation from Spirit in 2011.  Kadish is a citizen of the state of Virginia.

18.     Defendant Paul Fulchino ("Fulchino") is a Director of Spirit and a member of the Corporate Governance and Nominating Committee.   Fulchino received over $160,000.00 in compensation from Spirit in 2011.  Fulchino is a citizen of the state of Texas.

19.     Defendant Richard Gephardt ("Gephardt") is a director of Spirit and a member of the Compensation Committee and the Corporate Governance & Nominating Committee. Gephardt serves as a paid advisor to Onex Corporation, and also received over $150,000.00 in compensation directly from Spirit in 2011.  Gephardt is a citizen of the state of Virginia.

20.     Defendant Ivor Evans ("Evans") is a Director of Spirit and a member of the Audit Committee.  Evans is also an Operating Partner at HCI Equity Partners. Evans received over $160,000.00 in compensation from Spirit in 2011.   Evans is a citizen of the state of South Carolina.

21.     Defendant Charles Chadwell ("Chadwell") is a Director of Spirit.   Chadwell received over $160,000.00 in compensation from Spirit in 2011.  Chadwell is a citizen of the state of Florida.

22.     Defendant Tawfiq Popatia ("Popatia") is a director of Spirit and a member of the Corporate Governance & Nominating Committee and the Compensation Committee.  Popatia is also a Principal at Onex Corporation, which controls Spirit through ownership of in excess of 60% of the voting shares of the Company.  According to the 2011-2012 Proxy Statement, Mr.

Popatia has a relationship that qualified as a related person transaction. Popatia received over $150,000.00 in compensation from Spirit in 2011 which was paid directly to Onex Partners Advisor LP. Popatia is a citizen of the state of California.

23.     Philip D. Anderson ("Anderson") is the Senior Vice President and Chief Financial Officer of Spirit. Anderson received over $900,000.00 in compensation from Spirit in 2011. Anderson is a citizen of the state of Oklahoma.

24.     James Sharp ("Sharp") is the Chief Accounting Officer of Spirit. Sharp is a citizen of the state of Kentucky.

25.     DOES 1-10 are unnamed Defendants to be identified later in the litigation. The accounting improprieties described herein required the cooperation, actual or tacit, of a number of other parties in addition to the named Defendants. These parties will be added to this action as party defendants as they are identified.

26.     The defendants named above in ¶¶ 14 - 22 are referred to herein as the "Director Defendants."

27.     Defendants Turner, Anderson, and Sharp are referred to herein as the "Officer Defendants."

28.     Defendants Raborn, Chadwell, and Evans are referred to herein as the "Audit Committee Defendants."

29.     The defendants named above in ¶¶ 14 - 24 are referred to herein as the "Individual Defendants."

30.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Spirit's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

### JURISDICTION AND VENUE

31. This Court has jurisdiction in this case under 28 U.S.C. §1332, as the amount in controversy exceeds $75,000 and Plaintiff's citizenship is diverse from all of the Individual Defendants. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

32. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Spirit occurred in this District, and defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

33. This Court retains general jurisdiction over each named defendant who is a resident of Kansas. Spirit has a substantial presence in Kansas, including maintaining its executive offices and principal place of business at 3801 South Oliver, Wichita Kansas, and each of the Individual Defendants has had contacts with Kansas as a director and/or officer of Spirit, making exercise of personal jurisdiction over them proper. Additionally, this Court has specific jurisdiction over every named non-resident defendant because these defendants have sufficient minimum contacts with Kansas to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. The Individual Defendants' conduct was purposefully directed at Kansas and arose in Kansas, where Spirit maintains its corporate

headquarters.  Exercising jurisdiction over named non-resident defendants is therefore
reasonable.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

34.    By reason of their positions as officers, directors, and fiduciaries of Spirit and
because of their ability to control the business and corporate affairs of Spirit, the Individual
Defendants at all times relevant to this action owed Spirit and its shareholders fiduciary
obligations of trust, loyalty, good faith, and due care, and were at all times relevant to this action
required to use their utmost ability to control and manage Spirit in a fair, just, honest, and
equitable manner.  The Individual Defendants were required to act in furtherance of the best
interests of Spirit and its shareholders so as to benefit all shareholders equally and not in
furtherance of any individual personal interest or benefit.

35.    Each officer and director of the Company owed to Spirit and its shareholders the
fiduciary duty to exercise good faith and due diligence in the administration of the affairs of the
Company and in the use and preservation of its capital, property and assets, and the highest
obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company,
the Individual Defendants had a duty to promptly disseminate accurate and truthful information
with regard to the Company's operations, performance, management, projections, and forecasts
so that the market price of the Company's stock would be based on truthful and accurate
information.

### Additional Duties of the Audit Committee Defendants

36.    In addition to these duties, under the terms of its Charter, the Audit Committee
Defendants owed specific duties to Spirit to review and approve the Company's accounting
judgments, guidance, quarterly and annual financial statements, and earnings press releases.  The
Audit Committee's Charter provides in relevant part that the Committee is required to, among
other responsibilities:

-       Review and discuss with management, the independent auditor and the internal auditor (a) ***management's accounting policies, significant estimates and assumptions***, and key accounting decisions; . . . .

-       Review and discuss with management, the independent auditor and the internal auditor (a) major financial and other risk exposures; (b) the steps management has taken to minimize such risks; (c) ***management's risk assessment and risk management approach, policies, guidelines and practices;*** . . . . (e) management's ability to override internal controls; and (f) ***the disclosures on risk assessment and management in Spirit's proxy statement and periodic reports***.

-       Review and discuss with management and the independent auditor (a) ***all critical accounting policies and practices used by management;*** (b) major issues regarding accounting principles or financial statement presentations, including any significant changes in the selection or application of accounting principles; (c) major issues regarding the adequacy of internal controls and any special audit steps taken in light of material control deficiencies; (d) ***analyses prepared by management and/or the independent auditor on significant financial reporting issues and judgments made in connection with the preparation of financial statements, including analysis of the effects of alternative GAAP methods on the financial statements***; (e) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements; (f) the type and presentation of information included in earnings releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information); and (g) ***financial information and earnings guidance provided to analysts and rating agencies***.

-       Review and discuss with the independent auditor the matters required to be discussed by (a) Statement of Auditing Standards No. 61, including the auditor's responsibility under generally accepted auditing standards, ***the significant accounting policies used by management, accounting estimates used by management, and the process used by management in formulating them*** . . . .

 (c) Statement of Auditing Standards No. 100, including the review of interim financial information ***and any material modifications that need to be made to the interim financial information to conform with GAAP***; and (d) the Sarbanes-Oxley Act of 2002, the Dodd-Frank Act of 2010, and NYSE rules relating to the conduct of the audit or quarterly review.

-       ***Review Spirit's financial statements, including (a) prior to public release, review and discuss with management and the independent auditor Spirit's annual and quarterly financial statements to be filed with the SEC*** (including "Management's Discussion and Analysis" and management's disclosures regarding internal control over financial reporting and disclosure controls and procedures); (b) with respect to the independent auditor's annual audit report and certification, prior to release of the annual audited financial

statements, meet with the independent auditor without management present to discuss (i) the adequacy of Spirit's system of internal control over financial reporting and the audit procedures applied by the independent auditor that are related to internal controls, (ii) *the appropriateness of the accounting principles applied and the judgments, including estimates, made in the preparation of Spirit's audited financial statements,* and (iii) the quality of Spirit's financial reports; (c) recommend to the board whether to include the audited financial statements in Spirit's annual report on Form 10-K to be filed with the SEC; and (d) prior to submission to any governmental authority of any financial statements of Spirit that differ from the financial statements filed with the SEC, reviewing such financial statements and any report, certification or opinion thereon provided by the independent auditor.

**Access, Control, and Authority**

37.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Spirit, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

38.     Because of their advisory, executive, managerial, and directorial positions with Spirit, each of the Individual Defendants had access to adverse, material, non-public information about the financial condition, operations, and growth prospects of Spirit.

39.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Spirit, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

40.     To discharge their duties, the officers and directors of Spirit, including every one of the Individual Defendants, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Spirit were required to, among other things:

> - properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

- ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

- remain informed as to how Spirit conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

- ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

41.     As shown below, the Individual Defendants failed to carry out each of these obligations and are liable to Spirit for damages the Company sustained thereby.

## FACTUAL ALLEGATIONS

42.     Spirit designs, engineers, and manufactures structural components for commercial and military aircraft.  Spirit derives nearly all of its revenue from long-term supply contracts with three customers:  Boeing, EADS (Airbus), and General Dynamics.  Boeing is by far Spirit's dominant customer, representing about 60% of Spirit's current inventory of work in progress.

43.     Spirit was formed in 2004-2005 when Boeing announced its intention to divest certain of its manufacturing operations.  In late 2004 and early 2005, an investor group led by Onex Corporation formed Spirit AeroSystems Inc. and Spirit, as vehicles to acquire Boeing's manufacturing operations in Wichita, Kansas ("Boeing Wichita").

44.     Prior to the divestiture, Boeing Wichita was an internal supplier of component structures for Boeing.  In connection with the divestiture and acquisition, Spirit entered into a long-term supply agreement with Boeing, essentially a requirements contract covering certain component structures for the commercial life of the associated aircraft.

45.     Under this long-term contract, the prices that Spirit could charge for existing products on in-production models was contractually set through May 2013.

46.     Spirit also entered into a long-term supply contract for Boeing's new B787. Pricing under this contract was generally fixed through 2021, with prices subject to adjustment for production levels, abnormal inflation, and other factors such as design changes.

47.     Thus, the Individual Defendants knew in advance what prices Spirit would be able to charge for each sale of components completed under these contracts and, accordingly, based on known allocations of risk and the known and expected associated costs, could reliably predict whether those prices would result in a break-even, a profit, or a loss on each sale.

48.     Despite this, the Individual Defendants caused Spirit to improperly account for the costs associated with those contracts, artificially inflating the Company's earnings, and further made and condoned false and misleading statements regarding Spirit's earnings and performance.

### FALSE AND MISLEADING ACCOUNTING AND FINANCIAL REPORTING

49.     The Individual Defendants falsely represented, and caused the Company to falsely represent, Spirit's costs, earnings, and financial results.

50.     The Individual Defendants represented that Spirit recognizes costs and revenues according to GAAP and Financial Accounting Standards Board ("FASB") guidance.  As set forth in the Company's 2011 SEC Form 10-K (emphasis added):

> A significant portion of the Company's revenues are recognized under long-term, volume-based pricing contracts, requiring delivery of products over several years.  The Company recognizes revenue under the contract method of accounting and records sales and profits on each contract in accordance with the percentage-of completion method of accounting, primarily using the units-of-delivery method.  The units-of-delivery method recognizes as revenue the contract price of units of a basic production product delivered during a period and as the cost of earned revenue the costs allocable to the delivered units; *costs allocable to undelivered units are reported in the balance sheet as inventory.*

51.     The GAAP rules, however, do not permit a company to capitalize any of the costs of a contract deliverable, such as Spirit's products under its long-term delivery contracts, that exceed the payment the company will obtain for that deliverable.  For any contract on which a

loss is anticipated, GAAP requires recognition of the full amount of the loss as soon as it becomes evident.

52.     Despite the fact that under the long-term supply contracts the Individual Defendants knew the prices that Spirit would realize for its deliverables, and could therefore reliably predict that costs would far exceed the associated revenues, the Individual Defendants continued to improperly capitalize both past and current costs associated with those contracts.

53.     By early 2012 at the latest, the Individual Defendants knew that rapidly-mounting costs due to operational problems would not be recoverable from future contract revenue and therefore should have been recognized immediately as charges against earnings.  The Individual Defendants, however, continued to represent that these costs were being properly carried on the books as inventory costs.

54.     These accounting fictions and misleading statements were incorporated into Spirit's SEC filings throughout most of 2012.

55.     According to the Company's 2011 10-K annual report, filed February 23, 2012:

"[Spirit follows] the requirements of FASB authoritative guidance on accounting for the performance of construction-type and certain production-type contracts (the contract method of accounting), [under which] the impacts of revisions in estimates are recognized immediately when changes in estimated contract profitability become known."

56.     This statement in Spirit's 2011 10-K was false when made because the Individual Defendants, who each personally signed off on the 10-K, were aware or with reasonable diligence should have been aware that Spirit was not following the requirements of FASB guidance on accounting for the costs associated with its long-term contracts.  That guidance required that, "When the current estimates of total contract revenue and total contract cost indicate a loss, a provision for the entire loss on the contract, known as a forward-loss charge, is recorded to cost of sales in the period *in which it becomes evident*." (emphasis added)

57.     Spirit's 2011 10-K annual report further stated that:

Fourth quarter 2011 earnings includes the impacts of $28.5 [million] forward-loss charge on the G280 program, $18.3 [million] forward-loss charge on the B747-8, a $3.0 [million] forward-loss on the A350 XWB non-recurring wing contract and a $9.2 [million] reduction to previously recognized forward-losses on the Sikorsky CH-53K helicopter program.

Third quarter 2011 cost of sales included an impact of a $10.0 [million] forward-loss recorded for the Sikorsky CH-53K helicopter program.

Second quarter 2011 earnings included the impacts of a $53.3 [million] forward-loss charge for the G280 wing program, a charge of $9.0 [million] due to a change in estimate to increase warranty and extraordinary rework reserves and a charge of $1.8 [million] in early retirement incentives elected by eligible UAW-represented employees. Also includes recognition of $236.2 [million] of deferred revenue for non-recurring work on the B787-9 DMI and for pricing adjustments, all associated with the B787 Amendment, which was finalized in 2011.

58.    These statements were also material and false when made, as the Individual Defendants knew or should have known at the time that the charges listed were greatly understated.  Much larger charges against earnings had already been incurred by this time, as costs continued to be improperly capitalized and deferred rather than recognized immediately.

59.    The Individual Defendants further caused Spirit to state in the Company's 2011 10-K, that, "As of December 31, 2011, we were and expect to continue to be in full compliance with all covenants contained in the indentures governing the 2020 Notes and the 2017 Notes for the foreseeable future."

60.    This statement was also material and false when made.  Because of the charges that had been improperly deferred and would soon have to be recognized, the Individual Defendants knew or should have known that the Company would be in technical default on covenants governing its lending facilities as soon as the incurred charges were properly accounted.

61.    The Individual Defendants caused all of Spirit's public announcements during this period to be false when made, as the Individual Defendants knew that the incurred losses should have been recorded as charges against earnings well before the date these were disclosed to the public.

13

62.     Finally, in its Form 10-Q, Quarterly Report for the period ending September 27, 2012, the Individual Defendants caused Spirit to state:

> Contract block quantity is projected to fully absorb the balance of deferred production inventory.   Capitalized pre-production and deferred production inventories are at risk to the extent that we do not achieve the orders in the forecasted blocks, as those categories of inventory are recoverable over future deliveries.   In the case of capitalized pre-production this may be over multiple blocks.   Should orders not materialize in future periods to fulfill the block, potential forward loss charges may be necessary to the extent the final delivered quantity does not absorb deferred inventory costs.

63.     This statement too was materially false when made, as all Individual Defendants knew or with reasonable diligence should have known at that time that, rather than potential forward loss charges associated with loss of orders, such charges were inevitable under current contract terms and operational status, continued to be incurred, and under GAAP rules should already have been recognized and disclosed.

64.     The Individual Defendants deliberately failed to timely recognize these costs and to take the appropriate charges against earnings even when they knew to a certainty that the costs would not be recoverable under the associated contracts.   Sources within the Company have confirmed that these actions were intentional.

65.     According to Confidential Witness 1 (hereinafter "CW-1"), who is familiar with the accounting practices of the Company, the fact that these charges should have been recognized and disclosed was known within the Company at least from the beginning of 2012, and not just discovered in late September 2012 as the Individual Defendants claimed.

66.     CW-1 identified at least four members of Spirit's financial accounting and management staff who participated in manipulating the data in order to hide costs and losses and temporarily improve the appearance of the Company's financial performance.

67.     CW-1 also reported that additional financial risks, costs, and losses still remain undisclosed, and the true picture of the Company's financial status has yet to be fully revealed.

68.     The Individual Defendants had several motives for these improprieties.   In addition to the gross effect on share price, Spirit bases significant percentages of several of the Individual Defendants' compensation on formulas based on Company earnings.

69.     Spirit bases its Executive Short-Term Incentive Program compensation (STIP) awards 75% on three equally-weighted quantitative metrics and 25% on qualitative considerations.   For 2012, the quantitative metrics are: (1) EBIT, (2) EBIT as a percentage of revenues and (3) total free cash flow, and the qualitative considerations include program stability and the improvement of manufacturing processes and productivity.

70.     All of the quantitative metrics, and at least some of the qualitative ones, depend on reported management effectiveness, company financial performance, and earnings.

71.     The Officer Defendants' incentive compensation was therefore based between 75% and 100% on measures that would have been negatively influenced by the honest and timely disclosure of the manufacturing problems and the recognition of the attendant charges.

72.     This fiction, however, could not be maintained indefinitely.   On October 25, 2012, Spirit announced that it was recording a write-down of $590 million of costs, all in the third quarter of 2012.

## FALSE AND MISLEADING PUBLIC STATEMENTS

73.     Between November 2011 and October of 2012, the Individual Defendants caused the Company to issue no fewer than 40 press releases.   Not one of these disclosed the crucial facts that Spirit was and had been experiencing critical failures in management of its manufacturing operations, or that very large magnitude – almost $600 million – in charges were incurred during this period.

74.     For example, on February 9, 2012, Spirit issued a press release reporting its fourth quarter and full year 2011 financial results.   The release stated in part, quoting defendant Turner (emphasis added):

"In 2011 our core businesses generated *strong operating performance* while we successfully executed increased rates across the business.   *While the year was*

*challenging for some of our development programs*, it also marked many important milestones . . . .  "The global demand for the current and next generation of large commercial airplanes is expanding *as we continue to execute well* in our established businesses."

75.     The February 9, 2012 press release did not mention the rapidly-mounting charges against earnings that were already known to the Individual Defendants but were concealed from investors in violation of GAAP and New York Stock Exchange ("NYSE") rules.

76.     On May 3, 2012, Spirit issued a press release reporting its first quarter 2012 financial results.  In that press release, the Company maintained its full-year 2012 guidance.  The release stated in part (emphasis added):

> "Spirit's first quarter results reflect the increase in demand for our core products *and the benefits of our ongoing commitment to productivity and efficiency across the company*," said President and Chief Executive Officer Jeff Turner.

77.     On August 2, 2012, Spirit issued a press release announcing its second quarter 2012 financial results.  Even as late as August 2012, the Individual Defendants caused the Company to continue to maintain its previous full-year 2012 guidance unchanged.  The release stated in part:

> "Overall, this quarter exemplifies how Spirit AeroSystems is well positioned to meet the demand for large aircraft as we are focused on continued reliability, capability, and teamwork to align the business for long-term value creation," Turner concluded.

78.     Even as the Individual Defendants knew for a certainty that manufacturing problems were cascading across product lines and had already caused the Company to incur massive charges, not a hint of this was disclosed to investors.  None of the Company's press releases during this period disclosed that large charges against earnings were piling up, had not been accounted for properly, and presented an immediate and significant threat to Spirit's earnings and financing.

79.     Because the Individual Defendants concealed and failed to disclose these very large charges, Spirit's share price was artificially inflated.

80.     On August 8, 2012, Spirit reached a high of $25.85 per share.

81.     Then, on October 25, 2012, Spirit issued a press release admitting that the Company had to record some $590 million in forward charges for costs previously incurred in its manufacturing operations.  The charges would erode $2.90 per share out of the Company's third quarter earnings.

82.     The Company further admitted that as a result of the charges, Spirit had had to petition its lenders to adjust the terms of the Company's loan and credit facility in order for the Company not to be in technical default.

83.     The October 25, 2012 press release stated in part, as purported justification for the massive charge against earnings:

> "The execution of our diversification and growth strategy has proven very complex," said Jeff Turner, President and Chief Executive Officer, "as we rapidly expanded our customer-base, manufacturing sites, and product design capabilities, while managing multiple development programs with significant design changes and schedule delays.  It is unfortunate that we have struggled on these development efforts. . . ."

84.     Following the issuance of the press release on October 25, 2012, certain of the Individual Defendants hosted a conference call to expound upon the press release and address questions from analysts and investors.  During the call, defendant Turner stated:

> Throughout these transitions, we are experiencing higher than forecast costs, particularly in supply chain.  As you can see, all but one of these programs is located in our Tulsa facility.  So let me take a moment to discuss how the complexity and rapid growth in our Tulsa plant increased the cost risk on these programs.
>
> This complexity revolves around the transition of a traditionally build-to-print location to a design/build operation.  Over the last seven years, we took a plant that was skilled operationally and added design/build programs and new customers, including resourcing the development of the 787 wing components. Subsequently, we have grown that facility from less than 1000 employees in 2005 to over 3000 today.  Along with the change in program delays on new programs, this complexity in growth has contributed significantly to the cost growth on these programs.

85.     The Individual Defendants knew that these statements in the October 25, 2012 press release and conference call were false and misleading when made.  The fact that Spirit's programs and staff had expanded between 2005 and 2012, and that Spirit was experiencing

operational problems due to a failure to manage the expansion successfully, was not just discovered in the third quarter of 2012.  All of these factors, and the associated costs, were known to Turner and to the other Individual Defendants long before they were disclosed in the October 25, 2012 press release and conference call.

86.    In that same conference call, Turner continued:

These charges are indicative of the challenges we faced managing multiple new programs in a complex high-growth environment and one highly disrupted by multiple new program schedule slides.

I am extremely disappointed in how we have managed this complexity.  I've shared with many of you the lessons we have learned over the past seven years and would say categorically that I underestimated the organizational learning required to manage what became an unplanned concurrency of a number of new programs.

87.    The surprise announcement, coupled with the striking magnitude of the unanticipated charge and the vague and unconvincing reasons given for that charge, shocked the market.  As a result of this news, Spirit stock plunged $6.55 per share to close at $15.11 per share on October 25, 2012, a decline of 30% in a single day, on extremely high volume.

88.    In reaction to the news, on October 26, 2012 Deutsche Bank issued an analyst report which stated in part:

. . . 30% sell-off justified on size of charge and weak confidence in mgmt. [sic]

A charge of $590M [almost 20% of SPR's market cap prior to announcement] was about 3-4x bigger than what most would have pinned as worst case.  While a charge was widely expected, the size was staggering, and was followed by a difficult conf. call where little incremental details, particularly on cash, were provided (during which the last 10% drop in the 30% drop for the day was solidified).

89.    As a result of the Individual Defendants' deliberate improper accounting, and false statements and omissions regarding that accounting, Spirit common stock traded at artificially inflated prices.  When the truth emerged and the Company finally accounted for the incurred charges properly, the Company's shares dropped precipitously.

**DEFENDANTS' ACTIONS DAMAGED SPIRIT**

90.     As a result of the Individual Defendants' actions, Spirit committed multiple accounting improprieties and disseminated false and misleading public statements.  Spirit's reputation, for technical excellence, for reliability, and for truthfulness, has suffered greatly.  Adding to the enormous amount of financial damage the Company has already incurred, Spirit is likely to be the subject of securities fraud class actions.

91.     As a direct and proximate result of the Individual Defendants' actions, Spirit has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

- costs of compensation and benefits paid to the Individual Defendants who breached their duties;
- costs incurred from defending and paying a settlement or judgment in class actions that will likely be filed for violations of federal securities laws;
- increased financing costs; and
- damage to the Company's market value and ability to secure financing.

92.     Moreover, the Individual Defendants' actions have irreparably damaged Spirit's corporate image and goodwill.  For at least the foreseeable future, Spirit will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Spirit's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES**

93.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Spirit, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Spirit's Board.

94.     The Individual Defendants breached their duty of loyalty and good faith by improperly accounting for known costs, by failing to properly review and correct that accounting as represented to shareholders, by disseminating false and misleading statements about the Company's financial status, and by allowing other Defendants to do so.

95.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company will likely be the subject of a class action lawsuit alleging violations of securities laws.  As a result, Spirit will continue to expend significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

96.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

97.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Spirit, regarding the Individual Defendants' management of Spirit's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at Spirit and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

98.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

99.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

100.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by, among other things, causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

101.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

102.    Plaintiff brings this action derivatively in the right and for the benefit of Spirit to redress injuries suffered, and to be suffered, by Spirit as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Spirit is named as a nominal defendant solely in a derivative

capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

103.    Plaintiff will adequately and fairly represent the interests of Spirit in enforcing and prosecuting its rights.

104.    Plaintiff was a shareholder of Spirit at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is currently a Spirit shareholder.

**Demand on the Board Is Excused Because Such Demand Would be Futile**

105.    Spirit's Directors as of the filing of this action consists of the following nine individuals: Defendants Turner, Johnson, Raborn, Kadish, Fulchino, Gephardt, Evans, Chadwell, and Popatia.  Plaintiff has not made a demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the multiple reasons set forth below.

*Demand Is Excused Because the Director Defendants' Conduct Was Not a Valid Exercise of Business Judgment*

106.    The Individual Defendants' decision to improperly account for Spirit's costs, and to issue or condone improper statements about these costs and about Spirit's corresponding financial performance, is not protected by the business judgment rule.  At the time of this decision, the Director Defendants were at a minimum grossly negligent in authorizing such conduct due to accounting improprieties that would have been obvious and with reasonable diligence should have been uncovered before they permitted such improprieties to continue.

107.    The acts complained of constitute violations of the fiduciary duties owed by Spirit's officers and directors and these acts are incapable of ratification.  The Director Defendants signed the Company's SEC filings, authorized and/or permitted the improper statements therein and disseminated directly to the public and are beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

*Demand Is Excused As Director Defendants Face a Substantial Likelihood of Liability*

108.    The Director Defendants face a substantial likelihood of liability because they had the power and ability to control and prevent the dissemination of the foregoing false and misleading statements, and specifically because these Defendants along with Turner and Anderson personally signed Spirit's 2011 Form 10-K Annual Report which contained false and misleading statements regarding Spirit's accounting, costs, and earnings.   These defendants affirmatively allowed such statements to be made and to influence the market, which had the effect of artificially inflating the value of the Company's stock.   These defendants' failure to exercise proper control over the Company's public disclosures exposes them to potential personal liability, rendering demand upon them futile.

*Demand Is Further Excused as to the Audit Committee Defendants*

109.    In addition, defendants Chadwell, Evans, and Raborn serve and served on the Company's Audit Committee, and therefore, had the specific responsibility and obligation to review and approve the accounting judgments that led to the improper cost accounting, and to review and correct Spirit's public filings before these were filed with the U.S.  Securities and Exchange Commission ("SEC"). These Defendants therefore actively condoned or recklessly failed to review all of the misleading accounting documents and public statements described herein.  Accordingly, these Defendants face a substantial likelihood of liability for violations of state or federal securities laws and state common law and demand upon these directors is futile.

*Demand is Excused as to Defendants Facing Personal Liability for False Statements*

110.    Defendants Turner and Anderson also face a substantial likelihood of liability for personally making improper statements about the Company's financial status, and each of the Director Defendants face liability for allowing these Defendants to continue to make improper statements about the Company's financial status.  Turner, Anderson, and each of the Director Defendants signed and certified Spirit's SEC filings which were false and misleading when published, and each of the Director Defendants knew, or in reckless disregard for their fiduciary

duties, should have known about the financial implications of concealing Spirit's improper accounting practices. Nevertheless, each of these Defendants either participated directly in or allowed the improper statements to continue.

*Demand Is Excused As None of the Board Members Are Fully Independent*

111.   Furthermore, none of the Board members are fully independent of Defendant Popatia and the Onex entities.

112.   Spirit is a "controlled corporation," as disclosed in Spirit's 2011 Form 10-K. Spirit is under the absolute voting control of Onex Corporation and its associated entities (hereinafter "Onex Entities" or "Onex"). The resulting gross disparity in voting power among the Directors is shown in the following table.

### Spirit AeroSystems Share Voting Power, Board Members

| Board Member | Class A shares owned | Class B shares owned | Votes | Percentage of voting power |
|---|---|---|---|---|
| Tawfiq Popatia, representing the Onex Entities[1] | | 22,411,638 | **224,116,380** | **64%** |
| Jeffrey L. Turner | 184,753 | 377,932 | 3,964,073 | 1.1% |
| Charles L. Chadwell | 22,721 | | 22,721 | 0.006 |
| Ivor Evans | 15,050 | 1,691 | 31,960 | 0.009 |
| Paul Fulchino | 27,495 | 1,691 | 44,405 | 0.012 |
| Richard Gephardt | 16,661 | | 16,661 | 0.005 |

---

[1] These entities and their share ownership include: 12,583,318 shares of Class B Common stock held by Onex Partners LP (35.9% of total voting power); 5,949,997 shares of Class B Common stock held by OAH ["Onex American Holdings"] Wind LLC (17.0% of total voting power); 3,383,282 shares of Class B Common stock held by Onex Spirit Co-Invest LP (9.7% of total voting power); and lesser holdings by Wind EI II LLC and Onex U.S. Principals LP. Onex Corporation controls these shares through an inter-locking web of shell corporations, subsidiaries, and limited partnerships including Onex Partners LP, Onex Partners GP, Onex Partners GP LP, Onex American Holdings II LLC, OAH Wind LLC, Onex American Holdings Subco LLC, Wind Executive Investco LLC, Wind EI II LLC; Onex U.S. Principals LP, Onex American Holdings GP LLC, and Onex Spirit Co-Invest LP.

| Robert Johnson | 13,184 | | 13,184 | 0.004 |
|---|---|---|---|---|
| Ronald Kadish | 28,015 | | 28,015 | 0.008 |
| Francis Raborn | 15,050 | 22,500 | 240,050 | 0.067 |

113.    Onex Corporation, Onex Partners LP, and affiliated entities, hereinafter referred to collectively as "Onex," beneficially own 22,411,638 shares of Spirit's class B common stock.

114.    Spirit's Class A common stock affords its holders one vote per share on all matters to be voted on by stockholders.  Class B common stock shareholders, in contrast, are entitled to <u>ten</u> votes per share.  Consequently, Onex controls approximately 64% of the combined voting power of all of Spirit's outstanding common stock.  Onex accordingly exercises "a controlling influence over our business and affairs ***and will have the power to determine all matters submitted to a vote of our stockholders***, ***including the election of directors*** and approval of significant corporate transactions such as amendments to our certificate of incorporation, mergers and the sale of all or substantially all of our assets."  (Spirit Form 10-K, 2011)

115.    Spirit explicitly admits that "the interests of our controlling shareholder [Onex] may conflict with the interests" of all of the Company's other shareholders.

116.    Onex is represented on Spirit's Board by Defendant Popatia.  In turn, Gerald W. Schwartz, the Chairman, President and Chief Executive Officer of Onex Corporation, controls a majority of the voting rights of the shares of Onex Corporation.

117.    Spirit explicitly admits that "***Onex could cause corporate actions to be taken even if the interests of Onex conflict with the interests of our other stockholders,***" and that this concentration of voting power could have the effect of deterring or preventing actions by Spirit that might otherwise be beneficial to stockholders. (Spirit 2011 Form 10-K)

118.    Because the Onex entities own more than 50% of the combined voting power of the common stock of Spirit, Spirit is deemed a "controlled company" under the rules of the New

York Stock Exchange.   As a result, Spirit qualifies for, and relies upon, the "controlled company" exception to the board of directors and committee composition requirements under the rules of the NYSE.   Pursuant to this exception, Spirit is exempt from rules that would otherwise require that Spirit's board of directors be comprised of a majority of "independent directors" (as defined under the rules of the NYSE), and that Spirit's compensation committee and corporate governance and nominating committee be comprised solely of "independent directors."

119.   In addition to the reasons set forth above, therefore, a reasonable doubt is raised regarding whether the Board can independently consider a demand because none of the Director Defendants is fully independent of Onex, whose interests Spirit admits may conflict with those of all its other shareholders. By virtue of Onex's voting power, Onex can simply remove any director that votes in defiance of Onex's wishes.

### Demand Is Excused As To Directors Who Are Explicitly Not Independent

120.   Spirit explicitly admits that, under its own and SEC policy, at least four of its directors are not independent and that Spirit's compensation and corporate governance and nominating committees are not comprised solely of independent directors.

121.   Spirit's 2012 Proxy Statement acknowledges that Defendants Fulchino, Gephardt, Popatia and Turner are not independent.  Demand is therefore excused as to these four directors.

### Demand Is Excused as to Defendants Who Had Prohibited Transactions

122.   Demand is further excused as to Defendants Turner and Raborn, as these Defendants committed prohibited insider trading transactions and cannot be expected objectively to vote to investigate their own alleged improprieties, as this could expose them to significant personal liability.   Defendant Turner sold over $1 million worth of Spirit stock in the year preceding this action.   Defendant Raborn sold over $500,000 worth of Spirit stock two months before the announcement the sent the stock plummeting.   These sales of Spirit stock were made on the basis of material, nonpublic information, such that these Individual Defendants received a material benefit that other shareholders, not privy to that information, did not receive.

123.     Demand is further excused as to Defendant Turner, the Chairman of the Board of Spirit, as Turner announced his retirement immediately after the massive charge against earnings was became public.  Turner cannot be expected vote to investigate or prosecute charges that he committed management improprieties on the very eve of his retirement from the Company.

124.     Spirit has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and Current Board have not filed any lawsuits against any Defendants who were responsible for that wrongful conduct, to attempt to recover for Spirit any part of the damages Spirit suffered and continues to suffer.

125.     Spirit's current and past officers and directors are anticipated to have directors' and officers' ("D&O") liability insurance provided by Spirit.  However, D&O liability insurance policies almost uniformly contain provisions that eliminate coverage for any action brought directly between insureds, known as the "insured versus insured exclusion."  As a result, if these directors were to cause Spirit to sue themselves or certain of the officers of Spirit, they would forfeit the protection of their directors' and officers' policies.  If the suit is brought derivatively, as this action is brought, such insurance coverage will provide the means for the Company to effectuate recovery.  Defendant Directors are considered unlikely to cause Spirit to sue themselves as, whether or not they maintain D&O coverage, they would face a large uninsured liability without recourse to indemnification.

126.     Further, confidential sources inside the Company have indicated that the $590 million charge, extraordinary as it was, still does not represent the full extent of the impropriety and that the accounting irregularities are still ongoing.  Even though the Director Defendants have had full knowledge of the claims and causes of action raised herein and have had sufficient time to act on that knowledge, the Board has failed to investigate the wrongdoing and failed to seek to recover for Spirit for any of the wrongdoing alleged.

127.     The fact that the Director Defendants have yet to take steps to halt these practices, and continue to condone them, is conclusive that a demand on the Board would be futile.

128. For all of these reasons, individually and in concert, demand would be futile on the current Board of Directors of Spirit.

129. Plaintiff has not made any demand on the other shareholders of Spirit to institute this action since such demand would be a futile and useless act for at least the following reasons:

- Spirit is a publicly held company with nearly 2 billion shares outstanding;
- Spirit has several thousand shareholders;
- making a demand on such a number of shareholders would be impossible for plaintiff who has no reasonable way of finding out the names, addresses, or phone numbers of all shareholders; and
- making a demand on all shareholders would force plaintiff to incur excessive expenses, even if all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants For Breach of Fiduciary Duty

130. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131. As alleged in detail herein, the Individual Defendants by reason of their positions as officers and directors of Spirit and because of their ability to control the business and corporate affairs of Spirit, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Spirit in a fair, just, honest, and equitable manner.

132. Defendants Turner and Anderson violated their duties of care, good faith, and loyalty by making improper statements in the Company's press releases, conference calls, and other public disclosures and the remaining Individual Defendants breached their duty of care by allowing those statements to be made and not corrected. These Defendants were reckless or grossly negligent in making and allowing statements that concealed material facts from investors. In light of the known incurred costs, contract pricing, and GAAP, SEC and NYSE accounting rules, these Individual Defendants had no reasonable basis to make or allow the misleadingly positive statements about Spirit's financial results.

133.   Defendants Turner and Raborn violated their duties of care, good faith, and loyalty by engaging in improper sales of Spirit stock on the basis of material, nonpublic information.

134.   The Audit Committee Defendants breached their fiduciary duty of loyalty by condoning the accounting improprieties and by recklessly failing to verify the improper accounting decisions, and by knowingly or recklessly allowing the Company to make improper statements in its public filings, press releases, and earnings conference calls concerning the Company's financial health, business prospects, and forward guidance.

135.   All of the Director Defendants breached their fiduciary duty of loyalty by personally signing and certifying the Company's SEC filings containing improper accounting that they knew or with the exercise of reasonable diligence should have known misrepresented the true state of the Company's finances.

136.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

137.   Plaintiff, on behalf of Spirit, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

138.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.   At the time of the Company's false and misleading statements and all relevant times stated herein, the Individual Defendants received bonuses, stock options, stock appreciation rights, and/or similar such compensation from Spirit in breach of their fiduciary duties.  The Individual Defendants were unjustly enriched thereby.

140.   In addition, those Defendants who sold Spirit shares while in possession of material, adverse, non-public information, and specifically Defendants Turner, Raborn, and

potentially one or more Doe Defendants, enriched themselves at the expense of the investing public and the investors in Spirit to whom they sold.

141.   As a direct and proximate result of the Individual Defendants' actions alleged herein, both the Company and the Defendants' trading counter-parties have suffered significant damages, as alleged herein.

142.   To remedy the Individual Defendants' unjust enrichment, this Court should order all Defendants so enriched to disgorge all proceeds the Individual Defendants received from their compensation, bonuses, stock options, and any improper insider transactions.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, plaintiff, on behalf of Spirit, prays for judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, and unjust enrichment;

B.   Directing Spirit to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Spirit and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to allow shareholders to vote on the following Corporate Governance improvements:

1.   a proposal to strengthen the Company's controls over public disclosures;
2.   a proposal to strengthen the Board's supervision of the Company's financial accounting and reporting process, including the internal audit, review, and control functions;
3.   a proposal to ensure that the Company's accounting judgments are made in compliance with all applicable guidance and the Company's own express policies;
4.   a proposal to strengthen the Company's controls over potentially improper insider transactions; and,
5.   a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters.

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Spirit has an effective remedy;

D.    Awarding to Spirit restitution from defendants, and each of them, and ordering disgorgement of all improper profits, benefits, or other compensation obtained;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 2013

SHAMBERG, JOHNSON & BERGMAN

By: LYNN R. JOHNSON

Lynn R. Johnson, KS #07041
Douglas R. Bradley, KS #23046
Shamberg, Johnson & Bergman
2600 Grand Blvd., Suite 550
Kansas City, MO 64108
Phone: 816-474-0004
Fax: 816-474-0003
ljohnson@sjblaw.com
dbradley@sjblaw.com

Frank J. Johnson
Johnson & Weaver, LLP
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: 619.230.0063
Facsimile: 619.255.1856
frankj@johnsonandweaver.com

## VERIFICATION

I, Irving Feldbaum, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 31 day of January, 2013.

By: _____